UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| 2016 LAMBORGHINI HURACAN | ) | |
| VIN: ZHWUC2ZF1GLA04413; | ) | Case No.  22 CV 01684 |
| 2017 PORSCHE 991 911 CARRERA S COUPE | ) | |
| VIN: WP0AB2A9XHS123487; | ) | |
| 2017 MASERATI GHIBLI S | ) | |
| VIN: ZAM57RTA1H1230190; | ) | |
| 2020 LAND ROVER EVOQUE SE, | ) | Judge Joan H. Lefkow |
| VIN: SALZP2FX7LH006525; and | ) | |
| $677,932.25 SEIZED FROM U.S. BANK | ) | |
| ACCOUNT XXXXXXXX9624 | ) | |
| HELD IN THE NAME OF | ) | |
| FRANCESCO DISTEFANO D/B/A | ) | |
| DISTEFANO ENTEPRISES, LLC, | ) | |
| | ) | |
| Defendants, *In Rem*. | ) | |

**AMENDED VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

The United States of America, by MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, for its amended verified complaint against the above-named defendant properties and in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure alleges as follows:

**NATURE OF THE ACTION**

1.      This is an action brought by 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C) and 984 for forfeiture *in rem* of the defendant property.  The United States seeks forfeiture of the properties described in paragraph three (3) below, which constitutes or was derived from

proceeds traceable to a violation of 18 U.S.C. § 1014 (fraudulent loan application) and/or 18 U.S.C. § 1343 (wire fraud).

2.     This amended complaint is verified by the attached Verification of Federal Bureau of Investigation Special Agent Scot Gill, which is fully incorporated herein.

## DEFENDANT *IN REM*

3.     The Defendant *in rem* consists of the following property:

(a)     2016 Lamborghini Huracan, VIN: ZHWUC2ZF1GLA04413 (**Vehicle 1**);

(b)     2020 Land Rover Evoque SE, VIN: SALZP2FX7LH006525 (**Vehicle 2**);

(c)     2017 Porsche 991 911 Carrera S Coupe, VIN: WP0AB2A9XHS123487 (**Vehicle 3**);

(d)     2017 Maserati Ghibli S, VIN: ZAM57RTA1H1230190 (**Vehicle 4**); and

(e)     $677,932.25 seized from U.S. Bank Account XXXXXXXX9624 held in the name of Francesco Distefano d/b/a Distefano Enterprises, LLC. (**Account 9624**)

(Hereinafter, the vehicles collectively as the "**Subject Vehicles**" and the vehicles and bank account as the "**Defendant Properties**").

4.     The **Defendant Properties** have been seized pursuant to search warrants. The funds listed in paragraph 3(e) above were seized from a bank account located at U.S. Bank and are currently in the custody of the United States Marshals Service.  Vehicle 3(a) was seized from 157 Oak Mill Street in Addison, Illinois; vehicle 3(b) was seized from 733 N. 8th Ave in Addison, Illinois; vehicle 3(c) was seized from 9051 Tampa Avenue located in Northridge, CA; vehicle 3(d) was seized from 1100 N. Clark Street in

Chicago Illinois; and all vehicles are in the custody of the United States Marshals Service.

## JURISDICTION AND VENUE

5.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1355(a).

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(2) because certain acts that gave rise to this action occurred within this district.

## BASIS FOR FORFEITURE

7.     This is a civil action *in rem* brought to enforce the provisions of 18 U.S.C. § 981(a)(1)(C), which provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to ... any offense constituting 'specified unlawful activity' (as defined in [18 U.S.C.] section 1956(c)(7) of this title), or a conspiracy to commit such offense." A violation of 18 U.S.C. § 1014 (fraudulent loan application) constitutes a "specified unlawful activity" under 18 U.S.C. § 1956(c)(7)(D). A violation of 18 U.S.C. § 1343 (wire fraud) constitutes a "specified unlawful activity" under 18 U.S.C. § 1956(c)(7)(A), which incorporates 18 U.S.C. § 1961(1)(D).

8.     The **Defendant Properties** are subject to forfeiture under 18 U.S.C. § 981(a)(1)(c) as real property which constitutes or is derived from, in whole or in part, proceeds traceable to specified unlawful activity, including but not limited to violations of 18 U.S.C. § 1014 (fraudulent loan application) and 18 U.S.C. § 1343 (wire fraud).

*The Paycheck Protection Program*

9.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

10.     In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

11.     A PPP loan application must be processed by a participating lender.  If a PPP loan application is approved, the participating lender funds the PPP loan using its own monies, which are 100% guaranteed by Small Business Administration ("SBA").

4

Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

12.     PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven by the SBA if the business spends the loan proceeds on these expense items within a designated period of time and at least 60 percent of the PPP loan is used for payroll expenses.

*Economic Injury Disaster Loans (EIDL)*

13.     Another source of relief provided by the CARES Act was the expansion of the Economic Injury Disaster Loan ("EIDL") Program, which provided loan assistance (including advances of up to $10,000) for businesses with 500 or fewer employees and other eligible entities for loans up to $150,000. The EIDL Program was designed to provide economic relief to small businesses that are experiencing a temporary loss of revenue.

14.     According to documents on the SBA's website, EIDL is a 30-year direct loan program that provides up to six months of working capital for small businesses to meet financial obligations and operating expenses that could have been met had the COVID-19 disaster not occurred. Unlike the SBA's Paycheck Protection Program loans, EIDL program loans are not forgivable and must be repaid by the borrower. According to the terms of the program, EIDL proceeds can be used to cover a wide array of working capital and normal operating expenses, such as continuation of health care benefits,

rent, utilities, and fixed debt payments. Recipients of EIDL funds are required to retain receipts and contracts for all loan funds spent for three years.

15.     To gain access to funds through the EIDL Program, small businesses applied through the SBA via an online portal and application. As part of the EIDL application process, the SBA required applicants to submit truthful information concerning the business and the business owner, including information as to the gross revenues and the cost of goods sold for the business during the twelve (12) months prior to January 31, 2020. Applicants were required to electronically certify that the information provided was accurate and were warned that any false statement or misrepresentation to the SBA may result in sanctions, including criminal penalties.

16.     EIDL funds were issued to the small business applicants directly from the United States Treasury.

17.     The EIDL Advance was a grant program offered together with the EIDL program.  The amount of the advance issued to the small business applicant was determined by the number of employees indicated on the EIDL application, $1,000 per employee, up to $10,000.

## SUMMARY OF FACTS

*Francesco Distefano and Distefano Enterprises LLC*

18.     Francesco Distefano is a resident of Addison, Illinois.

19.     According to records maintained by the Montana Secretary of State, Distefano is the Manager of Distefano Enterprises, LLC, a limited liability company

registered in Kalispell, Montana. His provided his contact information and business mailing addresses in Addison, Illinois.

*Distefano Enterprises PPP Loan*

20.     In approximately May of 2020, Distefano applied for a Payroll Protection Program ("PPP") loan on behalf of Distefano Enterprises from U.S. Bank. The PPP loan proceeds were deposited into an account at U.S. Bank, account number XXXXXXXX9624 in the name of Francesco Distefano d/b/a Distefano Enterprises LLC. ("**Account 9624**"), for which Distefano is the sole signatory.

21.     In the loan application, Distefano stated that, Distefano Enterprises had an average monthly payroll of $79,166 and had 14 employees. The application further represents that Distefano Enterprises requested the PPP loan for the purpose of paying its payroll costs, lease/mortgage interest payments, and utilities. Specifically, the application represents that Distefano Enterprises applied for a PPP loan of $197,915, which was 2.5 times the purported average monthly payroll cost of $79,166.

22.     In support of this application, Distefano submitted supporting documentation by email to U.S. Bank employees, including a U.S. Bank employee located in Tennessee. The emails included what purported to be ADP payroll summary reports for 2019 and a list of 9 employees for February 2020.

23.     Based upon the representations in the application, on or about May 13, 2020, U.S. Bank disbursed a PPP loan totaling $197,915 into **Account 9624**.

24.     According to payroll processing firm ADP, the "Payroll Run Report Summary Reports" documents that Distefano submitted in support of the PPP loan

application to U.S. Bank are fictitious. According to ADP, Distefano Enterprises was not an ADP client.

25. According to the Montana Department of Labor & Industry (MDLI) and the Illinois Department of Employment Security (IDES), neither agency had any record of any wages paid by Distefano Enterprises during 2019 or 2020.[1] IDES reported that Distefano applied for and received personal unemployment benefits between March 2020 and continuing into 2021, claiming that he was unemployed due to COVID-19 since March 29, 2020.

*The Distefano Enterprises EIDL and EIDL Advance*

26. In March 2020, Distefano, in his capacity as authorized representative of Distefano Enterprises, applied for an EIDL from the SBA. The application identified Distefano as the 100% owner of the company. The application further listed Distefano's SSN, the company's EIN, an address for Distefano on Oak Mill St in Addison, Illinois ("the Distefano Address"), and Distefano's email address (francesco@distefanoenterprisesllc.com). The application was submitted electronically through the SBA portal from IP address 73.74.247.202.

27. Comcast records show that the IP address 73.74.247.202 ("Addison IP") was registered to the Distefano Address that Distefano used on his EIDL application.

---

[1] The Montana Department of Labor & Industry is the state agency that runs Montana's employment services and administers that state's unemployment benefits. The Illinois Department of Employment Security is the state agency that runs Illinois's employment services and administers state unemployment benefits. Based on information supplied by MDLI and IDES, both agencies require employers to report employment and wages to these agencies on a quarterly basis.

28.     The EIDL application represented that Distefano Enterprises had 12 employees as of January 31, 2020, gross revenues of $2,500,000, and cost of goods sold of $2,120,000 for the 12 months prior to the date of the disaster.  The application requested an advance on the EIDL.

29.     As a result of these representations, on June 20, 2020, the SBA disbursed EIDL funds of $149,000 into **Account 9624**, and on June 18, 2020, the SBA disbursed an additional $10,000 advance grant into **Account 9624**.

30.     As detailed in paragraph 25 above, DiStefano Enterprises LLC reported no payment of wages during 2019 to either the MDLI or the IDES.

31.     A review of records from **Account 9624** for 2019 did not show deposits consistent with the $2,500,000 Distefano claimed as business revenue nor the $2,120,000 as costs of goods sold in the EIDL application; but rather, showed total credits of $716,911 and total debits of $722,593.

*West Coast POS and National POS Loans*

32.     In addition to the receipt of PPP and EIDL loan proceeds on behalf of Distefano Enterprises, **Account 9624** also received approximately $1,084,335 of proceeds from fraudulent PPP loans obtained by entities known as West Coast POS ("West Coast") and National POS ("National").

*West Coast PPP Loan*

33.     On approximately July 20, 2020, Arkansas Capital Corporation received a PPP loan application for West Coast in the amount of $1,090,891.  The application identified Sargis Urumieh ("Urumieh"), as President of West Coast.

34. The West Coast application initially represented that the business had 14 employees and an average monthly payroll of $436,356.37. The application cover page was later "corrected" to list 67 employees with the same average monthly payroll. In support of this application, on July 20, 2020, Urumieh sent Arkansas Capital a fictitious ADP payroll run report listing total payroll payments of $5,236,276 for 2019, as well as what purported to be a copy of a filed IRS Form 940 for tax year 2019, showing total payments to West Coast employees totaling $5,236,276.

35. Based upon the representations in the application and supporting documents, on approximately July 22, 2020, Encore Bank disbursed a PPP loan totaling $1,090,890 into a bank account West Coast maintained at Encore Bank that was opened to receive the PPP loan proceeds ("West Coast Account"). Encore was a bank whose deposits were insured by the FDIC.

36. The IRS identified the 2019 Form 990 was not filed with the IRS. Similarly, ADP identified the payroll run report submitted in support of the PPP application was fictitious. ADP further stated that West Coast was not an ADP client prior to the date of the PPP loan application.

37. In February 2021, Urumieh was interviewed by law enforcement and admitted that he was the owner of West Coast, but that it was Distefano's idea to apply for PPP loans in the name of West Coast. Urumieh stated that he provided personal and business information to Distefano for the purpose of a applying for the PPP loan. Urumieh further stated that Distefano created the application and supporting documents that were submitted for the loan. Urumieh further stated that the

information in the application regarding the number of employees and monthly payroll was false. Urumieh also stated that Distefano arranged for the payroll service that was ultimately used to receive PPP funds.

38.     I reviewed emails and text messages between Urumieh and Distefano and found these messages consistent with Distefano's preparation of the PPP application that was submitted on behalf of West Coast. This included a July 20, 2020, text screenshot from Distefano to Urumieh highlighting an email Distefano sent to Urumieh a few days earlier containing three documents named "940," "Application," and "WCP Pay…" that Urumieh needed to send to Arkansas Capital. In the next text message Distefano told Urumieh to "Send these 3."

39.     Urumieh subsequently emailed three documents to Arkansas Capital, which contained the West Coast PPP application, a false Form 940, and ADP payroll document  in order to obtain the West Coast PPP loan.

40.     On July 28, 2020, Distefano sent Urumieh a text message saying, "Hey doing something for u," followed by a text screenshot of a Microsoft Excel spreadsheet. Later the same day, Urumieh emailed Arkansas Capital corrected pages of the PPP applications for West Coast, as well as an Excel spreadsheet. The Excel spreadsheet, "WESTCOASTPOSINCexportPayrollRun06.xlsx," was 67 rows and listed 66 fictitious employees of West Coast. Microsoft Excel information from the spreadsheet identified Distefano as the author of the spreadsheet with a last modified date of July 28, 2020 at 12:40pm. A separate text on July 25, 2020 from Distefano to Urumieh, in the context of discussing PPP loans, wrote "We'll all go to jail now . . . "

11

41.     According to ADP, West Coast hired ADP to process payroll for that entity on approximately July 23, 2020, (after the date of the PPP loan application).   In connection with hiring ADP, they received a "reporting agent authorization form" on behalf of West Coast that was e-signed in the name of "Urumieh" but which was completed and signed from the Addison IP address associated with Distefano.   ADP records show that Distefano is the sole payroll contact for West Coast, and his phone number and Addison address are the ones listed for contact and delivery purposes. Distefano was the only registered user with the role "owner." ADP reported that Distefano authorized the individuals who would be paid as well as the amounts of compensation each would receive from the West Coast payroll in 2020 and 2021.   ADP Employee Summary records identified only eight employees for West Coast, seven of which were identified as W-2 wage earners and Distefano, as receiving non-W-2 compensation and reimbursement.

42.     From approximately July 2020 through December 2020, most of the West Coast PPP loan proceeds were transferred from the West Coast account to ADP for payroll processing. Distefano caused ADP to transfer approximately $349,545.06 of these funds to **Account 9624**.

*National PPP Loan*

43.    On approximately July 26, 2020, Arkansas Capital Corp received a PPP loan application on behalf of National in the amount of $1,722,645.51. The application identified Urumieh as the applicant and President of National.

44.    The application initially claimed that National had 19 employees and an average monthly payroll of $689,058.20. The application cover page was "corrected" on July 28, 2020 to list 123 employees with the same monthly payroll as listed in the initial cover page. In support of the National PPP application, on July 26, 2020, an email was sent to Arkansas Capital, with a carbon copy sent to Distefano. Attached to the email was what purported to be an ADP Payroll Summary Report for 2019 that showed employee wages of approximately $8,272,698.45 and what purported to be an IRS Form 941 for the first quarter of 2020 of $2,157,170.32.

45.    On approximately July 27, 2020, an email was sent to Arkansas Capital, with a copy sent to Distefano, which contained a purported IRS Form 940 for tax year 2019 reporting wages of $8,269,698.45.

46.    Based on these false statements, on July 29, 2020, Encore Bank deposited $1,722,645.50 of PPP loan proceeds into National's account at Encore Bank.

47.    The IRS identified the 2019 Form 940 submitted in support of the loan as one that was not filed with the IRS. Similarly, ADP identified the Payroll Summary Report submitted in support of the National loan was fictitious. ADP further stated that National was not an ADP client prior to the date of the application, and only became a client on July 28, 2020.

48.     Urumieh was interviewed by law enforcement and admitted that he was the owner of National, which at the time of the PPP loans, was a dormant company. He further stated that it was Distefano's idea to apply for a PPP loan in the name of National, and that Distefano created the application and supporting documents for National's PPP loan. Urumieh further stated that information regarding the number of employees and monthly payroll on National's PPP loan was false. Urumieh also stated that Distefano arranged for the payroll service that was ultimately used to receive PPP funds.

49.     I reviewed emails and text messages between Urumieh and Distefano and found these messages consistent with Distefano's preparation of the PPP application that was submitted on behalf of National. On July 28, 2020, Distefano sent Urumieh a text message saying, "Hey doing something for u," followed by a text screenshot of a Microsoft Excel spreadsheet with the title, "NATIONALPOSINCexportPayrollRun06.xls." Later the same day, Urumieh emailed Arkansas Capital corrected pages of the PPP applications National, as well as an Excel spreadsheet. The Excel spreadsheet, "NATIONALPOSINCexportPayrollRun06.xls," was 123 rows and listed 122 fictitious employees of National. Microsoft Excel information from the spreadsheet identified Distefano as the author of the spreadsheet with a last modified date of July 28, 2020, at 12:28pm. Other communications included a July 29, 2020, text message from Distefano to Urumieh saying, "I'm all ready to go for national. Waiting for money now."

14

50.     According to ADP,  National hired ADP to process payroll for that entity on approximately July 28, 2020, (after the date of the PPP loan application).   In connection with hiring ADP,  they  received a "reporting agent authorization form" on behalf of National that was e-signed in the name of "Urumieh" but which was  completed and signed from the Addison IP address associated with Distefano.  ADP records show that  Distefano is the sole payroll contact for National, and  his phone number and Addison address are the ones listed for contact and delivery purposes.  Distefano was the only registered user with the role "owner." ADP reported that Distefano  authorized the individuals who would be paid as well as the amounts of compensation each would receive from the National payroll in 2020 and 2021.   ADP Employee Summary records identified six active employees for West Coast, four of which were identified as W-2 wage earners  and  the  remaining  two – Distefano  and  his  wife – as  receiving non-W-2 compensation and reimbursement.

51.     From approximately July 2020, through January 2021, most of the National PPP loan proceeds were transferred from National to ADP for payroll processing.   Distefano's direction, Distefano caused ADP to transfer approximately $734,789.48 of these PPP loan proceeds to **Account 9624**.

52.     There were no other sources of funds into the West Coast and National accounts at Encore Bank other than the funds received as proceeds of the PPP loans. Distefano received proceeds of the PPP loans from West Coast and National both in the form of payroll disbursements from ADP, and an August 6, 2020, wire transfer of $95,000 directly from National's Encore Bank account to Distefano's **Account 9624**.  In total,

approximately $1,084,334.54 of funds from the West Coast and National accounts at Encore were transferred through ADP payroll transactions and direct wire transfers to Distefano's **Account 9624**.

*Bank Transactions and the Subject Vehicles*

53.     After the receipt of fraudulently obtained PPP and EIDL loan proceeds, Distefano used funds from **Account 9624** to purchase the **Subject Vehicles**. Absent the transfer of fraudulently obtained funds, Distefano would have had insufficient funds in **Account 9624** to purchase the **Subject Vehicles**.

54.     More specifically, on or about July 29, 2020, $1,722,646 of PPP loan proceeds were deposited into National's operating account. On or about July 31, 2020, Distefano directed ADP to transfer an approximate total of $391,994 of PPP funds fraudulently obtained by National POS and West Coast POS to **Account 9624**. This total included $388,821 from National POS and $3,173 from West Coast POS. On July 31, 2020, Distefano used approximately $283,205 from **Account 9624** to acquire **Subject Vehicles 1,  2,** and **4**.

55.     On July 31, 2020, the balance in **Account 9624** was approximately $409,801, of which $357,815 constituted fraudulently obtained EIDL and PPP loan proceeds directly issued to Distefano Enterprises in May and June 2020. The account balance on July 31 absent the Distefano Enterprises fraud proceeds was approximately $51,986. Absent the proceeds of all frauds related to Distefano Enterprises, National POS, and West Coast POS, Distefano would have had insufficient funds to purchase these vehicles.

56.     On August 6, 2020, **Account 9624** received a wire transfer of $95,000, which consisted of PPP funds fraudulently obtained by National POS. Distefano used $94,345 from this account to purchase **Subject Vehicle 3**.   On August 3, 2020, the beginning balance in **Account 9624** was approximately $409,801, of which $357,815 constituted fraudulently obtained EIDL and PPP loan proceeds directly issued to Distefano Enterprises in May and June 2020, as set forth in more detail above.   The account balance on August 3, absent the fraud proceeds and prior to the transfer of $95,000 in PPP funds from National POS, was approximately $51,986. From August 3 through August 6, the defendant also had other non-vehicle related deposits and expenditures resulting in an approximate balance of $47,868.   Absent the proceeds of the fraud, Distefano would have had insufficient funds to purchase **Subject Vehicle 3.**

### *Subject Vehicle 1 / 2016 Lamborghini Huracan*

57.     Records from Bentley Gold Coast, an auto dealer located in Chicago, show that on July 30, 2020, DISTEFANO purchased a 2016 Lamborghini Huracan bearing VIN: ZHWUC2ZF1GLA04413 (**Subject Vehicle 1**) for $195,445.   DISTEFANO paid for the vehicle by charging a total of $100,000 to an AMEX credit card, and with a cashier's check dated approximately July 31, 2020, in the amount of $95,445 from the Subject **Account 9624** payable to Gold Exotic Import LLC.[2]  A review of bank records showed that on July 31, 2020, **Account 9624** received $388,368.73 in PPP loan proceeds from the National POS loan and approximately $3,173.07 in PPP loan proceeds from the West Coast loan.   On the same day that DISTEFANO's  account received these proceeds, (that

---

[2]   Bentley Gold Coast and Gold Coast Exotic Imports LLC are part of a collection of assumed names managed by the Joe Perillo Dealer Group.

National and West Coast obtained by fraud as described above) DISTEFANO transferred $95,445 to the dealership and $105,000 to AMEX to pay for charges on the credit card he used to pay for **Subject Vehicle 1.** On July 31, 2020, Distefano took steps to title and obtain license plates for this vehicle in the name of DiStefano Enterprises LLC, in the State of Montana. On September 1, 2020, the Montana Department of Motor Vehicles issued title to this vehicle in the name of DiStefano Enterprises LLC and registered this vehicle in the State of Montana; however, this vehicle was domiciled in Addison, Illinois.

### *Subject Vehicle 2 / 2020 Land Rover Range Rover Evoque*

58.     Land Rover of Hinsdale records reveal that on approximately September 9, 2019, DISTEFANO purchased a 2020 Land Rover Range Rover Evoque bearing VIN: SALZP2FX7LH006525 (**Subject Vehicle 2**) for approximately $55,034. Bank records show that on approximately July 31, 2020, DISTEFANO obtained a cashier's check payable to Chase Auto for loan #11925214214400 for a payoff of **Subject Vehicle 2** in the amount of $46,509.39 with funds from **Account 9624**. As set forth above, **Account 9624** received loan proceeds obtained fraudulently by National and West Coast around July 31, 2020. On August 27, 2020, DISTEFANO transferred title to this vehicle to Distefano Enterprises LLC, registered this vehicle in the State of Montana, but domiciled this vehicle in Addison, Illinois.

18

### *Subject Vehicle 3 / 2017 Porsche 911 Carrera*

59.     Records from Napleton Westmont Porsche reveal that on August 6, 2020, DISTEFANO purchased a 2017 Porsche 911 Carrera bearing VIN: WP0AB2A9XHS123487 (**Subject Vehicle 3**) for $94,345.  Distefano paid for **Subject Vehicle 3** with an AMEX credit card charge of $5,000 and with business check #1212 in the amount of $89,345, drawn on **Account 9624**.   On August 6, 2020, – the day of the purchase – $95,000 of PPP loan proceeds were transferred from the National POS account at Encore Bank to **Account 9624**.  The following day, on August 7, 2020, **Account 9624** received $3,673.07 in PPP loan proceeds from West Coast POS; $3,665.38 in PPP loan proceeds from National POS; and $21,332 from IDES for unemployment benefits.   On August 27, 2020, DISTEFANO titled this vehicle to Distefano Enterprises LLC, registered this vehicle in the State of Montana, after which he caused the vehicle to be relocated from Illinois to Northridge, California.

60.     On February 13, 2021, DISTEFANO told law enforcement agents that he purchased a Porsche, but falsely stated that he sold it back to the Napleton Porsche dealership.  However, agents learned that in approximately August 2020, Distefano actually shipped the Porsche to Urumieh in California.

61.     In March 2021, the Porsche was recovered from Sargis Urumieh in Northridge, California.  Urumieh turned over the keys to the agents and directed the agents to the location where he stored it.  On December 20, 2021, Urumieh told agents that DISTEFANO sent him the Porsche in payment for "residual payments" DISTEFANO owed to Urumiah.  Urumiah has filed no claim as to the Porsche.

### *Subject Vehicle 4 / 2017 Maserati Ghibli*

62.    Illinois Secretary of State records reveal that on approximately March 23, 2017, DISTEFANO leased a 2017 Maserati Ghibli bearing VIN: ZAM57RTA1H1230190 (**Subject Vehicle 4**), in which JP Morgan Chase Bank acted as the Lessor and DISTEFANO as the lessee. Maserati Capital records show that the maturity date of the vehicle lease was June 23, 2020, and the payoff amount to purchase the leased vehicle was $41,250.94 on or before August 23, 2020.   JP Morgan bank records show that on approximately July 31, 2020, DISTEFANO obtained a cashier's check payable to Chase Auto, number 11352484, in the amount of $41,250.94, using funds from  **Account 9624** to purchase **Subject Vehicle 4.**  On September 3,  2020, DISTEFANO titled this vehicle in the name of Distefano Enterprises LLC as owner in the State of Montana, registered this vehicle in the State of Montana, but domiciled vehicle in Addison, Illinois.

## <u>CONCLUSION</u>

63.    For the reasons set forth above, the defendant property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C) because it constitutes or was derived from proceeds traceable to fraudulent loan application and/or wire fraud offenses.

WHEREFORE, the United States of America requests:

a.    the defendant property be proceeded against for forfeiture and condemnation;

b.    due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed; and

c.    this court adjudge and decree that the defendant property be forfeited to the United States and disposed of according to law.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:   */s/ Patrick King*
_____
PATRICK KING
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

<u>VERIFICATION</u>

I, Scot Gill, hereby verify and declare under penalty of perjury, that I am a Special Agent with the Federal Bureau of Investigation and have been so employed since approximately 2011. As part of my duties as an FBI Special Agent, I investigate criminal violations relating to white collar crimes, including mail, wire, and bank fraud. I have participated in the execution of multiple federal search and seizure warrants.

I have read the foregoing Verified Complaint in this matter and the facts alleged are true and correct to the best of my knowledge and belief based upon my own personal knowledge as well as information I have received from other agents, persons and documents, and it does not include each and every fact known to me concerning this investigation.

I hereby verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _20_ day of December 2023.

Scot Gill
Special Agent
Federal Bureau of Investigation